1  Vanessa R. Waldref
2  United States Attorney
   Eastern District of Washington
3  Dan Fruchter
4  Tyler H.L. Tornabene
   Assistant United States Attorneys
5  Allie Jensen
6  Special Assistant United States Attorney
   Post Office Box 1494
7  Spokane, WA 99210-1494
8  Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JUN 0 7 2023

SEAN F. McAVOY, CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

9
        UNITED STATES DISTRICT COURT
10    FOR THE EASTERN DISTRICT OF WASHINGTON
11

12  UNITED STATES OF AMERICA,        1:23-CR-2029-SAB-1
13                                   INDICTMENT
                 Plaintiff,
14                                   Vio: 18 U.S.C. §§ 1349, 1347
15        v.                              Conspiracy to Commit Health
                                          Care Fraud
16  DAVID ANTONIO BECERRIL,               (Count 1)
17
                 Defendant.               18 U.S.C. §§ 1349, 1343
18                                        Conspiracy to Commit Wire
19                                        Fraud
20                                        (Count 2)
21                                        18 U.S.C. § 1347
22                                        Health Care Fraud
23                                        (Counts 3–7)
24                                        18 U.S.C. § 1343
25                                        Wire Fraud
26                                        (Counts 8–11)
27                                        18 U.S.C. § 1035
28                                        False Statements Relating to
                                          Health Care Matters
                                          (Counts 12–16)

INDICTMENT – 1

18 U.S.C. § 982(a)(7)
Forfeiture Allegations

The Grand Jury charges:

## Overview of the Conspiracy

1.      From February 2018 to September 2019, Defendant DAVID ANTONIO BECERRIL (BECERRIL), a licensed physician residing and practicing medicine in the Eastern District of Washington, together with other conspirators both known and unknown to the Grand Jury, devised, perpetrated, and participated in carrying out a scheme and artifice designed to enrich themselves financially by submitting, and causing to be submitted, false and fraudulent prescriptions and orders for medically unnecessary durable medical equipment (DME), primarily orthotic braces, and genetic tests for unwitting Medicare beneficiaries, and then falsely and fraudulently claiming and obtaining millions of dollars from Medicare for such braces and genetic tests.

2.      The purpose of the fraudulent DME and genetic testing-fraud scheme was to siphon dollars from Medicare to line the pockets of the scheme's participants by obtaining Medicare beneficiaries' personal information, creating false and fraudulent doctor's orders in order to make the DME and genetic testing appear to be medically appropriate and reimbursable under Medicare, and selling those falsified orders to laboratories and brace suppliers who then billed Medicare for the medically unnecessary genetic tests or braces. Defendant BECERRIL's role in the scheme was to sign the false and fraudulent orders falsely attesting to the medical necessity of the braces and genetic testing for beneficiaries whom he had never met, and did not treat, in order to make it appear as though the braces and genetic testing were medically necessary and ordered by a physician treating the patient, in order to obtain Medicare payment for the brace or test. In this manner,

BECERRIL and his known and unknown co-conspirators fraudulently obtained more than $1.5 million from Medicare solely for fraudulent braces and genetic testing fraudulently ordered and prescribed by BECERRIL before the fraud was uncovered.

3.    In the course of the fraudulent scheme, BECERRIL signed more than 2,800 doctor's orders, primarily for Medicare beneficiaries, all of whom he was not treating and with whom he had no physician-patient relationship—without speaking to or meeting a single supposed "patient." BECERRIL took an average of less than 40 seconds to review and sign each order and denied few or no orders for lack of medical necessity—even approving orders for braces for nonexistent joints for patients whose limbs had previously been amputated. In exchange for his fraudulent approvals, orders, and signatures, BECERRIL was paid by his co-conspirators in the amount of $20 per beneficiary.

4.    In this manner, and as described further herein, BECERRIL and his known and unknown co-conspirators falsely and fraudulently sought more than $4 million and falsely and fraudulently obtained at least $1.5 million from the Medicare program designated to treat and care for elderly and disabled Americans. BECERRIL continued to knowingly participate in the fraudulent scheme and conspiracy until the fraudulent scheme was uncovered.

GENERAL ALLEGATIONS

At all times relevant to this Indictment:

5.    Defendant DAVID ANTONIO BECERRIL was a resident of the Eastern District of Washington.

Medicare Program Coverage of DME and Genetic Testing

6.    Medicare is a federal health care benefit program that provides health insurance to elderly and disabled citizens in the United States. Medicare provides health insurance coverage for eligible health care services including hospital

INDICTMENT – 3

services, outpatient services, medical equipment, prescription drug costs, and certain types of diagnostic laboratory testing.

7.    Medicare covers only durable medical equipment (DME) that is reasonable and necessary for the treatment of illness or injury or to improve the functioning of a beneficiary's malformed body member. To be considered reasonable and necessary, DME must be ordered by a physician or other licensed provider and must be expected to make a meaningful contribution to the treatment of the patient's illness or injury or to the improvement of the patient's malformed body member. Orthotic braces—such as ankle, shoulder, and back braces—are a type of DME.

8.    The Centers for Medicare and Medicaid Services (CMS), which administers the Medicare program, and its Medicare Administrative Contractors, which are responsible for processing claims and promulgating coverage determinations in their designated geographic areas, have promulgated additional coverage requirements concerning braces, including, in some cases, requiring that the provider have a face-to-face visit with the patient before Medicare will reimburse for an orthotic brace ordered by the provider. During the relevant time period, as applicable here, CMS required a face-to-face visit in order for knee and lumbar brace prescriptions to be reimbursable by Medicare.

9.    Similarly, Medicare covers diagnostic laboratory testing only if such test is reasonable and necessary for the diagnosis or treatment of illness or injury. To be considered reasonable and medically necessary, and therefore eligible for Medicare reimbursement, clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary

INDICTMENT – 4

are considered not reasonable and necessary and therefore not reimbursable under Medicare.

**COUNT 1**

CONSPIRACY TO COMMIT HEALTH CARE FRAUD

10.    The Grand Jury re-alleges and incorporates by reference Paragraphs 1 through 9 of the Indictment as if fully set forth herein. Further, the allegations in all other counts in the Indictment are re-alleged and incorporated in this count as if fully set forth herein.

11.    Beginning no later than on or about February 27, 2018, and continuing until at least on or about September 9, 2019, in the Eastern District of Washington and elsewhere, Defendant DAVID ANTONIO BECERRIL and other persons and entities both known and unknown to the Grand Jury, did knowingly combine, conspire, and agree to commit Health Care Fraud in violation of 18 U.S.C. § 1347, referred to herein as the Conspiracy, to wit, knowingly devised and intended to devise a scheme and artifice to defraud and obtain money from and in the custody of Medicare, a health care benefit program, by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. §§ 1347, 1349.

Ways, Manners, and Means of the Conspiracy

12.    It was part of the Conspiracy that between on or about February 27, 2018, and September 9, 2019, Defendant DAVID ANTONIO BECERRIL, and his co-conspirators both known and unknown to the Grand Jury, perpetrated their fraudulent scheme on the United States and CMS by making numerous false and fraudulent statements and misrepresentations in order to fraudulently request and obtain Medicare reimbursement for DME, including orthotic braces, and genetic tests. These false and fraudulent statements and representations included fraudulent documentation that falsely represented that the DME and genetic testing were

INDICTMENT – 5

medically necessary, had been ordered by a physician treating the beneficiary and in the ordinary course of that treatment, and that the braces and genetic tests would be used in the course of treatment for a specific medical problem.

13.    It was part of the Conspiracy that BECERRIL's co-conspirators, both known and unknown to the Grand Jury, obtained personal identifying information of Medicare beneficiaries, including beneficiaries' names, addresses, phone numbers, dates of birth, and Medicare numbers. BECERRIL's co-conspirators then created false and fraudulent doctor's orders, requisition forms, and medical documentation for DME and/or genetic tests on behalf of those beneficiaries. The purpose of the falsified doctor's orders, documentation, and requisition forms was to make it appear as though the prescribed items were medically necessary and eligible for Medicare reimbursement.

14.    With respect to doctor's orders for DME, BECERRIL's known and unknown co-conspirators recorded information, including falsified information, about beneficiaries' medical condition, pain level, and location of pain. They also recorded false and fraudulent diagnoses and diagnostic codes, as well as a pre-selected prescription for an item of DME. With respect to DME, BECERRIL's co-conspirators further fabricated false and fraudulent "Clinical Summaries" that documented fictitious visits in which BECERRIL purportedly physically examined the beneficiary and determined that DME was medically indicated using a variety of clinical diagnostic tests and tools commonly used in treating joint pain and disorder. For example, prescriptions for knee braces included falsified and fabricated "Beighton Scores" and results of "Laxity Pivot Tests" on the Clinical Summaries. The purpose of the false and fraudulent Clinical Summaries was to make it appear as though BECERRIL was treating and had a face-to-face visit with the patient in which he examined the patient and determined that the prescribed item(s) were medically necessary and eligible for Medicare reimbursement. The

INDICTMENT – 6

test results and documents were fictitious: BECERRIL never examined any patients, and therefore never performed any of these tests, nor did he review results of tests performed by others. BECERRIL's signature was affixed to each falsified Clinical Summary.

15.    With respect to requisition forms (*i.e.*, doctor's orders) for genetic tests, BECERRIL's known and unknown co-conspirators created false and fraudulent genetic test orders for both preventative cancer screening and drug interaction screening. BECERRIL's known and unknown co-conspirators created the false and fraudulent orders, which included diagnostic codes that purported to describe a beneficiary's symptoms and/or personal or family history of cancer or other disease. With respect to genetic tests for drug interactions, the orders also included a list of medications purportedly taken by the patient. The fraudulent doctor's orders also affixed what appeared to be the patient's signature indicating that the patient had given informed consent.

16.    With respect to genetic tests, BECERRIL's co-conspirators further fabricated false and fraudulent "Clinical Summaries" that falsely documented the beneficiary's "Chief Complaint." For genetic testing orders for preventative cancer screenings, the falsified chief complaint indicated that the beneficiary wanted to be better informed of risks to them and their loved ones. For genetic testing orders for drug interaction screenings, the falsified chief complaint indicated that the beneficiary wanted to be better informed about possible drug interactions that they currently have. The Clinical Summaries also included, for cancer screening tests, purported family and personal histories of cancer, and for drug interaction tests, purported medications the beneficiary was currently taking. BECERRIL's signature was affixed to each Clinical Summary. In fact, the beneficiaries had no "Chief Complaint" with regard to the proposed test.  Instead, as further documented herein, the beneficiaries were the victim of telemarketing and mass

INDICTMENT – 7

marketing campaigns conducted by BECERRIL's known and unknown co-conspirators using their personal information. The beneficiaries had not sought these tests, but rather, as with the DME orders, had been contacted by telemarketing companies eager to obtain a portion of the Medicare reimbursement for the tests by convincing beneficiaries to go forward with the tests.

17.    With respect to genetic tests, BECERRIL's co-conspirators further generated false and fraudulent letters of medical necessity for beneficiaries. BECERRIL's signature was affixed to each letter. The letters falsely and fraudulently attested to BECERRIL's need for the test results to properly care for the beneficiary, and falsely and fraudulently stated that the test results would have a direct impact on BECERRIL's care for the beneficiary. In fact, BECERRIL did not made a determination of medical necessity for any of the tests, was not treating any of the beneficiaries for any medical issues, and did not use any of the requested genetic test results in the care or management of any beneficiary.

18.    As part of the Conspiracy, Defendant BECERRIL's known and unknown co-conspirators caused the false and fraudulent doctor's orders and requisition forms for DME and genetic tests to be sent to contracted physicians, including BECERRIL, via interstate wires, for signature. The doctor's orders were sent to an online "portal," which BECERRIL accessed from the Eastern District of Washington and elsewhere using a username and password. BECERRIL's engagement with the portal was recorded and stored in a database, including the times at which he viewed and signed each doctor's order and, as of April 2019, the IP address of the user opening and signing the orders, which typically was an IP address in Yakima, Washington. BECERRIL signed the doctor's orders by hand on the screen using a finger or stylus. The purpose of BECERRIL's signature was to falsely and fraudulently make it appear as though the prescribed genetic tests and DME were medically necessary and eligible for Medicare reimbursement, and that

INDICTMENT – 8

the DME and genetic tests had been ordered by a physician for a patient in the course of his medical practice.

19.     It was part of the Conspiracy that, between on or about February 27, 2018, and on or about September 9, 2019, BECERRIL signed over 2,800 false and fabricated doctor's orders for DME and genetic tests in the manner described herein. BECERRIL did not see, meet, speak to, or treat a single patient, nor did he ever review test results, vital signs, or medical records completed by any health care provider, or make any medical determination that the DME or genetic tests were medically indicated or necessary. Instead, BECERRIL spent, on average, less than forty seconds reviewing each doctor's order before signing to falsely and fraudulently attest to the medical necessity of the ordered item(s). BECERRIL did not refuse to sign a single order as being medically unnecessary.

20.     It was part of the Conspiracy that BECERRIL's co-conspirators then sold the false and fraudulent doctor's orders signed by BECERRIL to patient recruiters, who in turn sold them to DME companies, pharmacies, and laboratories. With respect to genetic tests, BECERRIL's co-conspirators further ran a mass marketing call center designed to contact beneficiaries by telephone using their compromised personal information and convince beneficiaries to take the medically unnecessary genetic tests and to take and send back a genetic sample (*i.e.* a cheek swab) so that the laboratories could bill Medicare for those tests. These DME companies, pharmacies, and laboratories that purchased the doctor's orders then used those doctor's orders and supporting documentation to submit false and fraudulent claims to Medicare for the DME and tests. For orders falsely and fraudulently signed by BECERRIL, each claim submitted by a co-conspirator listed BECERRIL and his unique National Provider Index (NPI) number as the ordering/referring provider to make it appear that a physician had ordered the

INDICTMENT – 9

DME or genetic test for a patient and therefore convince Medicare to reimburse for the DME or test.

21.    It was part of the Conspiracy that Defendant BECERRIL was paid by his co-conspirators $20 per patient for whom he falsely and fraudulently signed doctor's orders.

22.    All claims submitted to Medicare over the course of the Conspiracy were not eligible for reimbursement from Medicare because, among other things: the claims were not for treatment that was individually medically necessary; BECERRIL did not have a bona fide physician-patient relationship with any beneficiary; medical documentation did not support the necessity of the DME or genetic testing pursuant to Medicare reimbursement guidelines; the orders and supporting documentation contained materially false and fraudulent statements and representations; BECERRIL did not use the results of genetic testing in the treatment of any beneficiary; BECERRIL was paid a kickback of $20 for each order that he placed; and BECERRIL did not make a meaningful or reasonable diagnosis of medical necessity for any beneficiary using independent medical judgment.

23.    Over the course of the Conspiracy, and through its fraudulent conduct and its false and fraudulent statements and representations, BECERRIL's co-conspirators falsely and fraudulently submitted over $1.1 million in DME claims for unreasonable and unnecessary DME to Medicare with BECERRIL as the referring/ordering provider. Medicare paid over $400,000 of those claims.

24.    Over the course of the Conspiracy, and through its fraudulent conduct and its false and fraudulent statements and representations, BECERRIL's co-conspirators falsely and fraudulently submitted over $3 million in claims for unreasonable and unnecessary genetic testing to Medicare with BECERRIL as the referring/ordering provider. Medicare paid over $1.1 million of those claims.

INDICTMENT – 10

25.     In all, the Conspiracy successfully defrauded the United States and the CMS of over $1.5 million for DME and genetic testing orders falsely and fraudulently signed by BECERRIL for patients that he was not treating, did not examine or assess, with whom he had no physician-patient relationship, and whom he never met or spoken to.  BECERRIL shared in these proceeds through the per-patient payments made to BECERRIL by his known co-conspirator.

<u>Specific False Statements Made and False Claims Caused to Be Submitted by BECERRIL</u>

26.     BECERRIL knowingly participated in the above Conspiracy with respect to hundreds of beneficiaries residing and located in the Eastern District of Washington, as well as beneficiaries in the Western District of Washington.

27.     It was part of the Conspiracy that on or about February 27, 2018, Defendant BECERRIL contracted with known co-conspirator Real Time Physicians, LLC ("Real Time") to purportedly provide medical services to individuals identified by Real Time by conducting "individual patient assessment review[s]." BECERRIL's participation in the scheme consisted of logging onto an online portal using a username and password, reviewing doctor's orders for DME or genetic tests for Medicare beneficiaries that had been pre-populated by Real Time, and falsely and fraudulently signing those orders.

28.     During his participation in the Conspiracy, Defendant BECERRIL did not speak with, examine, or treat any patient to whom he was purportedly providing medical services; consult with any treating health care provider about any patient's current symptoms or medical history; perform any physical exam; obtain accurate descriptions of patients' current symptoms; review any medical records or documentation recorded by any other provider, or any information beyond a page or two of conclusory information recorded by Real Time on the order itself; or verify with any patient or other provider that information provided

INDICTMENT – 11

by Real Time on the pre-populated doctor's order was accurate. Although each beneficiary's phone number was provided on each doctor's order, BECERRIL did not call a single beneficiary to assess symptoms, medical necessity, medical history, discuss whether or how the test or DME could be beneficial for the patient, or even whether the patient wanted the test or DME, answer any questions that the patient might have concerning the DME or test, explain how the DME/test worked, follow up with the patient, or otherwise provide any actual medical services.

29.    The DME orders viewed and signed by BECERRIL were one page in length and included the following information: the beneficiary's name, address, and phone number; an insurance section displaying the word "MEDICARE" and the beneficiary's Medicare number; BECERRIL's identifying information, including his NPI; a "Prescription Selection" in which a DME prescription code was pre-checked; a pre-populated diagnosis code; pre-populated "Doctor Notes" reciting purported physical symptoms; and a space for BECERRIL's signature. The signature block read: "By my signature, I am prescribing the items listed above and certify that the above-prescribed item(s) is medically indicated and necessary and consistent with current accepted standards of medical practice and treatment of this patient's medical condition."

30.    The genetic testing orders viewed and signed by BECERRIL differed by laboratory, but typically were one page in length and included the following information: the beneficiary's name, address, and phone number; an insurance section displaying the word "MEDICARE" and the beneficiary's Medicare number; BECERRIL's identifying information, including his NPI; a selection of genetic testing being requested; an "Informed Consent" section displaying the beneficiary's purported signature, and a space for BECERRIL's signature. The specific wording of the physician attestations varied by laboratory, but each attestation included false and fraudulent representations and promises purporting to

state that the genetic test had been ordered by BECERRIL in the course of his medical practice and that the test was medically necessary for the specific patient.

31.    BECERRIL's enthusiastic participation in the Conspiracy continued until he was caught. On or about September 9, 2019, BECERRIL received a letter from a CMS contractor informing him that a review of his DME billing practices indicated that he was in violation of his assignment as a Medicare provider because he was falsely and fraudulently prescribing and ordering DME for beneficiaries that he was not treating and with whom he had no physician-patient relationship. Only at this point did BECERRIL cease his participation in the Conspiracy.

32.    Through his participation in the Conspiracy, BECERRIL earned and received a total of at least $37,340 provided to him by his co-conspirators in return for his fraudulently signing false and fraudulent medical orders for genetic testing and DME. According to data contained in a database maintained by Real Time, BECERRIL's effective hourly rate, based on the number of orders he signed and length of time it took him to sign each order, was more than $1,000 per hour for his participation in the Conspiracy electronically signing orders.

33.    Despite not examining any patients or any medical records, and never making any determination that the genetic testing or DME was, in fact, medically indicated or necessary, BECERRIL falsely and fraudulently signed each and every doctor's order with which he was presented, based on database information maintained by Real Time, of which the below are simply examples of BECERRIL's false and fraudulent conduct in the Eastern District of Washington in furtherance of the conspiracy and using interstate wires. BECERRIL often falsely and fraudulently signed and attested to the medical necessity of more than one brace per beneficiary; indeed, for more than fifty beneficiaries, BECERRIL ordered and attested to the medical necessity of more than four different braces. Additionally, BECERRIL falsely signed and submitted orders for braces to fit non-

existent joints for patients for whom the limb in question had previously been amputated.

34. The following are by way of illustration and example.

DME: Patient V.G.

35. For example, on or about September 30, 2018, on behalf of beneficiary V.G., a 71-year-old Medicare beneficiary residing in Othello, Washington, in the Eastern District of Washington, BECERRIL falsely and fraudulently signed and attested to the medical necessity of three braces: a lumbar brace, a knee brace, and a shoulder brace. Real Time records indicate that BECERRIL took a total of 16 seconds to sign the lumbar brace order, 14 seconds to sign the knee brace order, and 14 seconds to sign the shoulder brace order. BECERRIL signed all three orders despite having never treated, examined, or even spoken to V.G.; having never reviewed any medical records for V.G. from any other health care providers or consulted with any other providers who had treated V.G.; and without exercising any professional or medical judgment concerning V.G. or V.G.'s purported need for any braces.

36. The only information reviewed by BECERRIL concerning V.G. on the doctor's orders was contained in the "Doctor Notes" section of each order. The following are the "Doctor Notes" regarding V.G. for each of the three DME prescriptions signed by BECERRIL for the lumbar, knee, and shoulder brace, respectively. The falsified information provided was effectively identical for each brace; to illustrate, all differences are highlighted in bold.

Patient reports chronic **Lower back** pain for 1 Year. Patient states pain is **sharp** with a pain scale of 9 and pain worsens with movement. Pain is caused by Injury and is described as Constant. Previous treatments with heat, ice, and rest have been unsuccessful to control pain level.

Patient reports chronic **Knee Left** pain for 1 Year. Patient states pain is **sharp** with a pain scale of 9 and pain worsens with movement. Pain is

caused by Injury and is described as Constant. Previous treatments with heat, ice, and rest have been unsuccessful to control pain level.

Patient reports chronic **Shoulder Left** pain for 1 Year. Patient states pain is **achy** with a pain scale of 9 and pain worsens with movement. Pain is caused by Injury and is described as Constant. Previous treatments with heat, ice, and rest have been unsuccessful to control pain level.

37.    As evidenced by this example, the falsified information in the "Doctor Notes" section was often virtually identical for each brace purportedly required. Because these records did not reflect actual treatment or medical conditions, and were being falsified solely for the purpose of requesting Medicare reimbursement, the purported length of time pain had been experienced, cause of pain, level and description of pain, and past attempts to control pain were often identical for each purportedly affected body part. Nonetheless, BECERRIL signed every order presented to him for each beneficiary, often taking mere seconds to do so—even for multiple near-identical orders for a single beneficiary.

38.    In fact, V.G. has no knee or shoulder pain. V.G. does not know BECERRIL and has never spoken with him. V.G. does have back pain, but he has never discussed it with anyone on the phone, and only speaks to his primary care physician about his medical conditions, who was not consulted about any of the purported braces. Yet BECERRIL's falsely and fraudulently signed physician order enabled Real Time to sell the fraudulent physician orders to co-conspirators who then submitted false and fraudulent claims to Medicare for all three braces on V.G.'s behalf, thus billing Medicare over $2,750 for this medically unnecessary equipment, of which Medicare paid over $2,000. Finally, V.G. reported that he never received any of the braces so ordered.

DME: Patient A.S.

39.    As stated above, BECERRIL signed doctor's orders for DME for joints for Medicare beneficiaries who had previously had their purportedly affected

INDICTMENT – 15

limbs amputated. For example, on or about October 17, 2018, BECERRIL falsely and fraudulently prescribed both a right and left ankle brace for beneficiary A.S., who resided in Toppenish, Washington, in the Eastern District of Washington, under the diagnosis of "Traumatic arthropathy, left ankle and foot." Arthropathy refers to a joint disease; however, A.S.'s left leg had been amputated below the knee in 2016. Nonetheless, the "Doctors Notes" section reads:

> Patient reports chronic Ankle Left, Ankle Right pain for 20 years. Patient states pain is sharp with a pain scale of 9 and pain worsens with movement. Pain is described as Constant. Previous treatments with heat, ice, and rest have been unsuccessful to control pain level.

40.    BECERRIL took a total of sixteen seconds to "review" and sign this false and fraudulent doctor's order, attesting with his signature that "I am prescribing the items listed above and certify that the above-prescribed items is medically indicated and necessary and consistent with current accepted standards of medical practice and treatment of this patient's physical condition." Medicare was then falsely and fraudulently billed over $900 for the ankle braces thus ordered, which it denied as being medically unnecessary.

Genetic Tests: Patient D.S.

41.    On or about December 10, 2018, BECERRIL signed a doctor's order for genetic testing for Medicare beneficiary D.S., who resides in Malaga, Washington, in the Eastern District of Washington. The doctor's order included no information about D.S.'s current symptoms or medical history. The order included six pre-populated ICD-10 diagnosis codes: Z86.010, K63.5, Z80.8, Z80.9, Z15.09, and Z13.71. These codes correspond to the following diagnoses: Personal history of colonic polyps (Z86.010), Polyp of colon (K63.5), Family history of malignant neoplasm of other organs or systems (Z80.8), Family history of malignant neoplasm, unspecified (Z80.9), Genetic susceptibility to other malignant neoplasm (Z15.09), and Encounter for nonprocreative screening for genetic disease carrier

INDICTMENT – 16

status (Z13.71). The doctor's order requested a hereditary cancer test of 134 specified genes.

42.    BECERRIL viewed the doctor's order for 21 seconds before signing. His signature was applied next to a statement that read, in part, "I am authorized to order this test. The diagnosis codes listed above are accurate and supported by the information in the patient's records." His signature was also applied next to a "Follow up date" of December 17, 2018, which at the time of signing was one week in the future.

43.    BECERRIL falsely and fraudulently signed the doctor's order for D.S. despite that he had no access to D.S.'s medical records or knowledge of D.S.'s medical history, and so had no knowledge whether the diagnosis codes were accurate, and despite that he had not spoken with, met, treated, or otherwise had any physician-patient relationship whatsoever with D.S. Further, he signed and attested to the accuracy of the Z13.71 code for "Encounter for nonprocreative screening for genetic disease carrier status" despite his actual knowledge that he had not had any encounter with D.S., for nonprocreative screening for genetic disease carrier status or otherwise. He also signed despite that he had not followed up with D.S. on December 17, 2018, and had no plan to do so.

44.    BECERRIL's signature was further affixed to a Clinical Summary for D.S. bearing the same date as the doctor's order (December 11, 2018). The Clinical Summary indicated that D.S.'s "Chief Complaint" was "that they have had a previous personal/family history of cancer and would like to better [sic] informed of any further risk(s) to them and their loved ones." It further attested that "based on my evaluation of the patient's medical summary, I have ordered a single comprehensive hereditary cancer genetic test . . . . The patient has been instructed on how to complete the test(s) and understand [sic] that their results will be reviewed by the ordering physician and patient. . . ." However, BECERRIL did not

INDICTMENT – 17

evaluate the beneficiary's medical summary, instruct the beneficiary on how to complete the test, or review or plan to review the results of the test.

45.    BECERRIL's signature was further affixed to a "Hereditary Cancer Genetic Testing Letter of Medical Necessity." The letter included the following false and fraudulent statements, among others:

> "The purpose of this letter is to document medical necessity for hereditary cancer genetic testing for the patient so that I will receive the test results in order to pursue care for the patient . . .

> "A positive test result would confirm a genetic diagnosis and / or risk in the patient, and would ensure the patient is being managed appropriately. . . . A positive result would indicate that the patient has an inherited predisposition to cancer and could help guide treatment strategies and allow for surveillance of associated organ systems known to be of increased risk for cancer."

> "Specific actions may include: utilization of appropriate guidelines . . . to help guide decisions toward possible preventative measures; referral to a specialist . . . ; increased screening(s) . . . ; other cancer specific step-wise algorithms of care; provide an answer to the family about the underlying cause of the patient's condition . . . ; and isolate the underlying genetic cause allows for accurate family counseling and more precise estimation of recurrence risks for family members thus allowing family members to make informed, efficient and effective choices."

> "This genetic testing . . . will also directly impact the patient's medical management."

46.    The statements in the Letter of Medical Necessity were false and fraudulent because BECERRIL did not receive any test results for D.S. and did not pursue care for D.S. based on those test results; BECERRIL did not use the results to ensure that D.S.'s care was being managed properly; neither BECERRIL nor

INDICTMENT – 18

any other provider used or planned to use these results to help guide treatment strategies; neither BECERRIL nor any other provider used or planned to use these results to help guide decisions toward possible preventative measures; and the genetic testing did not directly impact the patient's medical management, nor impact the patient's medical management in any way.

47.    In fact, D.S. had already undergone extensive cancer screening over a decade ago with her actual primary care physician, inclusive of genetic tests, blood tests, a colonoscopy, and CAT scans. In 2018, D.S. had no desire for any cancer screening.

48.    Nonetheless, due to BECERRIL's signature and attestation as the referring provider, for D.S.'s false and fraudulent, medically unnecessary, and unwanted tests, Medicare was billed by BECERRIL's co-conspirators in the amount of $12,860.96, of which it paid $5,105.47.

49.    BECERRIL never analyzed D.S.'s test results, followed up with D.S. to discuss the results of her test, made any recommendations or referrals based on the test results, or in any way used the tests results that he so ordered.

50.    On or about December 10, 2018, approximately one minute after signing the first genetic testing order for D.S., BECERRIL signed a *second* doctor's order for genetic testing for D.S., this time for drug interaction screening. This doctor's order included three false and fraudulent pre-populated ICD-10 diagnosis codes: F33.9, F31.9, and Z13.79. These codes correspond with: Major depressive disorder, recurrent, unspecified (F33.9), Bipolar disorder, unspecified (F31.9), and Encounter for other screening for genetic and chromosomal anomalies (Z13.79). The order also included the following medications purportedly being taken by D.S.: Tramadol, Ibuprofen, Albuterol Sulfate, Methocareamol, and Wellbutrin. BECERRIL viewed this order for 27 seconds before signing. With his signature, BECERRIL attested that "I hereby confirm that the test(s) are medically

INDICTMENT – 19

necessary for the treatment and/or plan of care for the patient. . . ." BECERRIL falsely and fraudulently signed this order and made this attestation despite having no knowledge whatsoever whether the test(s) so ordered were medically necessary for the treatment and/or plan of care for D.S., and with no plan or intention to use the test(s) to treat or care for D.S.

51.    BECERRIL's signature was further affixed on a Clinical Summary and "Pharmacogenetics Testing Letter of Medical Necessity" for D.S. These documents contained additional false and fraudulent statements; for example, the Pharmacogenetics Testing Letter of Medical Necessity reads, "The result of this genetic test will have a direct impact on this patient's treatment and management." This statement was patently false and fraudulent, as neither BECERRIL nor his co-conspirators had any plan whatsoever to use the result of the genetic test in the beneficiary's treatment and management, nor did BECERRIL or any other provider use the results of the genetic test in the treatment and management of D.S.

Genetic Tests: Patient D.W.

52.    On or about June 19, 2019, BECERRIL signed a requisition form on behalf of Medicare beneficiary D.W., a 79-year-old resident of Tacoma, Washington, for a genetic test for drug interaction screening. The order included no information about D.W.'s current symptoms or medical history and listed "Aspirin" as D.W.'s current medications. The order included four false and fraudulent pre-populated ICD-10 diagnosis codes: I25.9, Z79.01, Z79.02, and Z13.79. These codes correspond to the following diagnoses: Chronic ischemic heart disease, unspecified (I25.9), Long term (current) use of anticoagulants (Z79.01), Long term (current) use of antithrombotics/antiplatelets (Z79.02), and Encounter for other screening for genetic and chromosomal anomalies (Z13.79). The order requested a test of 23 specified genes.

INDICTMENT – 20

53.     BECERRIL viewed the order for 11 seconds before signing and attesting to the following: "Informed Consent and Statement of Medical Necessity: I hereby confirm that the test(s) are medically necessary for the treatment and/or plan of care for the patient. I further hereby confirm that the information has been supplied about genetic testing and that an appropriate . . . informed consent has been signed by the patient and is on file with the ordering healthcare professional."

54.     The statements to which BECERRIL attested on D.W.'s order forms were false and fraudulent because, amongst other things, D.W. does not have chronic ischemic heart disease, nor any other heart disease; BECERRIL did not have an encounter with D.W. for screening for genetic and chromosomal anomalies, nor did BECERRIL have knowledge of any other provider having such an encounter with D.W.; BECERRIL attested to the medical necessity of the genetic testing with no knowledge of D.W. or his medical history or current condition whatsoever, as BECERRIL well knew; the genetic tests were not medically necessary for D.W.; the ICD-10 codes were falsified; BECERRIL had no knowledge regarding whether D.W. gave informed consent to the genetic testing; and BECERRIL did not have a statement of informed consent on file.

55.     BECERRIL's co-conspirators billed Medicare $4,750 for the medically unnecessary genetic testing so ordered by BECERRIL on behalf of D.W., of which Medicare paid $1,145.54.

56.     The above are by way of example only. Beginning no later than February 27, 2018, and continuing until at least on or about September 9, 2019, BECERRIL, in furtherance of the Conspiracy, signed and electronically submitted from the Eastern District of Washington, thousands of false and fraudulent doctor's orders for DME and genetic tests in order to enable conspirators known and unknown to the Grand Jury to submit false and fraudulent claims in order to falsely and fraudulently claim Medicare payment for genetic tests and DME ordered and

INDICTMENT – 21

prescribed by BECERRIL. Each one of these claims was false and fraudulent because, among other things: the claims were not for treatment that was individually medically necessary; BECERRIL did not have a bona fide physician-patient relationship with any beneficiary; medical documentation did not support the necessity of the DME or genetic testing pursuant to Medicare reimbursement guidelines; the orders and supporting documentation contained materially false and fraudulent statements and representations; BECERRIL did not use the results of genetic testing in the treatment of any beneficiary; BECERRIL was paid a kickback for each order that he placed; and BECERRIL did not make a meaningful or reasonable diagnosis of medical necessity for any beneficiary using independent medical judgment.

All in violation of 18 U.S.C. §§ 1349, 1347.

## COUNT 2
## CONSPIRACY TO COMMIT WIRE FRAUD

57.    The allegations in paragraphs 1 through 56 of this Indictment are incorporated as though realleged herein. Further, the allegations in all other counts in the Indictment are realleged and incorporated in this count as if fully set forth herein.

58.    Beginning on or about February 27, 2018, and continuing until on or about September 9, 2019, in the Eastern District of Washington, Defendant DAVID ANTONIO BECERRIL and other persons and entities both known and unknown to the Grand Jury, did knowingly combine, conspire, and agree to commit Wire Fraud in violation of 18 U.S.C. § 1343, to wit, knowingly devised and intended to devise a scheme and artifice to defraud Medicare, the United States of America and the United States Centers for Medicare and Medicaid Services, and to obtain money and property from Medicare, the United States of America, and the United States Centers for Medicare and Medicaid Services, using signals and

sounds transmitted by means of wire communication in interstate commerce to execute and attempt to execute the said scheme and artifice to defraud in the ways, manners, and means described in Paragraphs 12 through 56 of this Indictment and referred to herein as the Conspiracy.

59.    As an essential part of the Conspiracy described herein, Defendant transmitted, and caused to be transmitted, by means of wire communication in interstate commerce, writings, signals, and sounds, from the Defendant's location in the Eastern District of Washington to one or more states outside of Washington in which the server for the online portal was stored, in order to advance, further, and carry on the Conspiracy. Each time that Defendant BECERRIL logged into the electronic portal maintained by Real Time from his residence in the Eastern District of Washington for purposes of reviewing, signing, and submitted false and fraudulent orders for DME and/or genetic testing, Defendant BECERRIL, and his co-conspirators both known and unknown to the Grand Jury, transmitted and caused to be transmitted interstate wires to and from the Eastern District of Washington, including those set forth in the substantive counts below.

All in violation of 18 U.S.C. §§ 1349, 1343.

**COUNTS 3 - 7**
HEALTH CARE FRAUD

60.    The allegations in paragraphs 1 through 59 of this Indictment are incorporated as though realleged herein. Further, the allegations in all other counts in the Indictment are realleged and incorporated in this count as if fully set forth herein.

61.    On or about each of the dates set forth below, in the Eastern District of Washington, Defendant DAVID ANTONIO BECERRIL knowingly and willfully executed and attempted to execute the above-described Conspiracy to defraud and obtain, by means of materially false and fraudulent pretenses,

INDICTMENT – 23

representations, and promises, the United States and the United States Centers for Medicare and Medicaid Services, money and property owned by and under the custody and control of Medicare, a health care benefit program as defined in 18 U.S.C. § 24(b), in connection with the delivery of and payment for health care benefits, items, and services, each pretense, representation, and promise constituting a separate count:

| COUNT | DATE | Description |
|---|---|---|
| 3 | On or about September 30, 2018 | Defendant BECERRIL's physician signature on an "RX/Medical Necessity Form" (referred to herein as a "doctor's order") for V.G. shoulder brace falsely and fraudulently indicating that "[b]y my signature, I am prescribing the items listed above and certify that the above-prescribed item(s) is medically indicated and necessary and consistent with current accepted standards of medical practice and treatment of this patient's physical condition." |
| 4 | On or about September 30, 2018 | Defendant BECERRIL's physician signature on a doctor's order for V.G. lumbar brace, separately falsely and fraudulently making the same attestation described in Count 3 |
| 5 | On or about September 30, 2018 | Defendant BECERRIL's physician signature on a doctor's order for V.G. knee brace, separately falsely and fraudulently making the same attestation described in Count 3 |
| 6 | On or about December 10, 2018 | Defendant BECERRIL's physician signature on a requisition form for D.S. genetic testing, falsely and fraudulently attesting that "I am authorized to order this test. The diagnosis codes listed above are accurate and supported by the information in the patient's records." |
| 7 | On or about June 19, 2019 | Defendant BECERRIL's physician signature on a requisition form for D.W. genetic testing, falsely and fraudulently attesting that "I hereby confirm that the test(s) are medically necessary for the treatment and/or plan of care for the patient." |

All in violation of 18 U.S.C. § 1347.

INDICTMENT – 24

## COUNTS 8 - 12
### WIRE FRAUD

62.    The allegations in paragraphs 1 through 61 of this Indictment are incorporated as though realleged herein. Further, the allegations in all other counts in the Indictment are realleged and incorporated in this count as if fully set forth herein.

63.    On or about each of the dates set forth below, in the Eastern District of Washington, Defendant DAVID ANTONIO BECERRIL for the purpose of executing the Conspiracy described above, and attempting to do so, did knowingly and with intent to defraud, based on materially false and fraudulent representations, omissions, pretenses, and promises, transmit and cause to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| COUNT | DATE | Description |
|-------|------|-------------|
| 8 | On or about September 30, 2018 | Transmission of doctor's order for V.G. shoulder brace from the Eastern District of Washington to Atlantic.net server located outside of the State of Washington |
| 9 | On or about September 30, 2018 | Transmission of doctor's order for V.G. lumbar brace from the Eastern District of Washington to Atlantic.net server located outside of the State of Washington |
| 10 | On or about September 30, 2018 | Transmission of doctor's order for V.G. knee brace from the Eastern District of Washington to Atlantic.net server located outside of the State of Washington |
| 11 | On or about December 10, 2018 | Transmission of a requisition form for D.S. genetic testing from the Eastern District of Washington to Atlantic.net server located outside of the State of Washington |

All in violation of 18 U.S.C. § 1343.

INDICTMENT – 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNTS 12 - 16
## FALSE STATEMENTS RELATING TO HEALTH CARE MATTERS

64.    The allegations in paragraphs 1 through 63 of this Indictment are incorporated as though realleged herein. Further, the allegations in all other counts in the Indictment are realleged and incorporated in this count as if fully set forth herein.

65.    On or about each of the dates set forth below, in the Eastern District of Washington, Defendant DAVID BECERRIL for the purpose of executing the Conspiracy described above, and attempting to do so, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services involving Medicare, a health care benefit program as defined in 18 U.S.C. § 24(b), each statement and representation constituting a separate count:

| COUNT | DATE | Description |
|-------|------|-------------|
| 12 | On or about September 30, 2018 | Defendant BECERRIL's false and fraudulent physician signature on doctor's order for V.G. shoulder brace and attestation as described in Count 3 |
| 13 | On or about September 30, 2018 | Defendant BECERRIL's false and fraudulent signature on doctor's order for V.G. lumbar brace and attestation as described in Count 4 |
| 14 | On or about September 30, 2018 | Defendant BECERRIL's false and fraudulent signature on doctor's order for V.G. knee brace and attestation as described in Count 5 |
| 15 | On or about December 10, 2018 | Defendant BECERRIL's signature on a requisition form for D.S. genetic testing, falsely and fraudulently attesting that "I am authorized to order this test. The diagnosis codes listed above are accurate and supported by the information in the patient's records." |

INDICTMENT – 26

| 16 | On or about June 19, 2019 | Defendant BECERRIL's signature on a requisition form for D.W. genetic testing, falsely and fraudulently attesting that "I hereby confirm that the test(s) are medically necessary for the treatment and/or plan of care for the patient." |

All in violation of 18 U.S.C. § 1035.

## NOTICE OF CRIMINAL FORFEITURE ALLEGATIONS

The Overview of the Conspiracy contained in paragraphs 1 – 4; the General Allegations contained in paragraphs 5 – 9; the Conspiracy to Commit Health Care Fraud allegations contained in paragraphs 10 – 56; the Conspiracy to Commit Wire Fraud allegations contained in paragraphs 57 – 61; and the Conspiracy to Commit Health Care Fraud, Conspiracy to Commit Wire Fraud, Health Care Fraud, Wire Fraud, and False Statements Related to Health Care Matters violations charged in this Indictment, are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures.

Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. §§ 1349, 1347; and/or Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1349, 1343; and/or Health Care Fraud, in violation of 18 U.S.C. § 1347; and/or Wire Fraud, in violation of 18 U.S.C. § 1343; and/or False Statements Relating to Health Care Matters, in violation of 18 U.S.C. § 1035, as set forth in this Indictment, the Defendant, DAVID ANTONIO BECERRIL, shall forfeit to the United States of America, any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense(s). The property to be forfeited includes, but is not limited to the following:

Money Judgments

A sum of money in United States currency, representing the gross amount of proceeds obtained by the Defendant as a result of the conspiracy to commit health care fraud offense.

A sum of money in United States currency, representing the gross amount of proceeds obtained by the Defendant as a result of the conspiracy to commit wire fraud offense.

A sum of money in United States currency, representing the gross amount of proceeds obtained by the Defendant as a result of the health care fraud offense(s).

A sum of money in United States currency, representing the gross amount of proceeds obtained by the Defendant as a result of the wire fraud offense(s).

A sum of money in United States currency, representing the gross amount of proceeds obtained by the Defendant as a result of the false statements related to health care matters offense(s).

With regard to substitute assets, if any property subject to forfeiture pursuant to 18 U.S.C. § 982(a)(7), as a result of any act or omission of the Defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), to seek forfeiture of

//

INDICTMENT – 28

1  any other property of said Defendants up to the value of the forfeitable property

2  described herein, all pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c).

4      DATED this _7_ day of June 2023.

6                 A TRUE BILL

Vanessa R. Waldref
United States Attorney

Dan Fruchter
Assistant United States Attorney

Tyler H.L. Tornabene
Assistant United States Attorney

Allie Jensen
Special Assistant United States Attorney

INDICTMENT – 29